CITY AND COUNTY OF DENVER,
Appellant,

v.

QWEST CORPORATION, a Colorado corporation; McImetro Access Transmission Services, Inc., a Colorado corporation; AT & T Communications of the Mountain States, Inc., a Colorado corporation; ICG Telecom Group, Inc., a Colorado corporation; and Teleport Denver, Ltd., a Colorado limited partnership, Appellees.

No. 99SA219.

Supreme Court of Colorado,
En Banc.

Feb. 26, 2001.

J. Wallace Wortham, City Attorney, David W. Broadwell, Donald E. Wilson, Andrew L. Weber, and Alice J. Major, Assistant City Attorneys, Kissinger and Fellman, P.C., Kenneth S. Fellman, Denver, CO, Attorneys for City & County of Denver.

Brownstein Hyatt & Farber, P.C., Andrew W. Loewi, David S. Chipman, Beth A. Doherty Quinn, Qwest Corporation, Roy Adkins, Federico Alvarez, Denver, CO, Attorneys for Qwest Corporation.

Colorado Municipal League, Geoffrey T. Wilson, Denver, CO, Amicus Curiae For Colorado Municipal League.

Holland & Hart, LLP, Gregory A. Eurich, Joseph W. Halpern, Denver, CO, Attorneys for AT & T Communications of the Mountain States, Inc.

Baker & Hostetler, LLP, John B. Moorhead, Michael J. Roche, Denver, CO, Attorneys for ICG TeleCom Group, Inc., and Teleport of Denver, Inc.

Petrie, Bauer, Vriesman & Hecht, LLP, Charles B. Hecht, Denver, CO; Jenner & Block, David Handzo, Janis C. Kesterbaum, MCIWorldCom., Inc., Thomas F. O'Neil, Kevin P. Gallagher, Washington, DC, Attorneys for McImetro Access Transmission Services, Inc.

Justice COATS delivered the Opinion of the Court.

The City and County of Denver appeals from the judgment of the Denver District Court granting declaratory relief for the plaintiff-telecommunications companies and dismissing Denver's inverse condemnation counterclaim in an action to declare invalid sections 10.5–1—10.5–41 of the Denver Revised Municipal Code. Because key provisions of the city ordinance conflict with a state statute regarding a matter of mixed state and local concern and the statute is not itself unconstitutional or invalid for any of the reasons asserted by Denver, the district court did not err in finding the ordinance invalid. Similarly, because the state statute granting telecommunications providers the right to occupy and utilize the public rights-of-way for the efficient conduct of their business does not authorize the taking of private property from Denver, the district court did not err in dismissing Denver's counterclaim. Therefore the judgment of the district court is affirmed.

## I.

The current controversy arises out of the 1996 decision of the United States Congress to substantially deregulate the telecommunications industry, and the state and local legislation implementing that decision. On February 8, 1996 the Federal Telecommunications Act of 1996 was signed into law. *See* 47 U.S.C. §§ 151–614 (1994 & Supp. 1998), Pub.L. No. 104–104, 110 Stat. 56 (1996) (the "Federal Telecommunications Act"). One of the express purposes of the Federal Telecommunications Act was "to promote competition and reduce regulation" of telecommunication providers. *Id.* This was to be accomplished, in part, by requiring state and local governments to regulate public rights-of-way on a competitively neutral and nondiscriminatory basis. 47 U.S.C. § 253.

On April 12, 1996, the state approved Senate Bill 96–10, which among other things added the new Article 5.5, entitled, "Rights-of-Way: Telecommunications Providers," to Title 38 of the Colorado Revised Statutes. *See* ch. 75, secs. 1–8, §§ 38–5.5–101 to –108, 1996 Colo. Sess. Laws 298, 298–305. Like the federal law, Senate Bill 96–10 expresses an intent "to encourage competition among the various telecommunications providers, to reduce the barriers to entry for those providers, to authorize and encourage competition within the local exchange telecommunications market, and to ensure that all consumers benefit from such competition and expansion." § 38–5.5–101(1)(a), 10 C.R.S. (2000). It further declares that its goals, which include providing citizens with affordable access to a wider range of telecommunications services at comparable rates throughout the state, can be accomplished only if telecommunications providers are allowed to develop "ubiquitous, seamless, statewide communications networks." § 38–5.5–101(1)(b).

While expressly acknowledging the right of political subdivisions [1] to exercise their lawful police powers, Senate Bill 96–10 grants telecommunications providers a right to occupy public rights-of-way without additional authorization or a franchise from local municipalities and explains that "[t]o require telecommunications companies to seek authority from every political subdivision within the state to conduct business [would be] unreasonable, impractical, and unduly burdensome." *Id.* In addition to barring political subdivisions from requiring providers that had already obtained the subdivision's consent or already lawfully occupied a public highway of the subdivision before enactment of the statute to seek additional consent, Senate Bill 96–10 specifically prohibits political subdivisions from levying any tax, fee, or charge on telecommunications providers for the right or privilege of engaging in a business or for use of a public highway other than certain license and permit fees that are reasonably related in time and occurrence to the costs directly incurred by the political subdivision. § 38–5.5–107. It also expressly bars the collection of any such taxes, fees, and charges through the provision of in-kind services as a condition of consent to use a highway. § 38–5.5–107(3).

Effective November 1, 1997, Denver enacted Ordinance No. 628–97 (the "Ordinance"), which is the object of challenge in this action. Denver Code §§ 10.5–1 to 5–50 (1997). It enacts a comprehensive regulatory scheme, requiring telecommunications providers to obtain a "Private Use Permit" before occupying or using (or continuing to occupy or use) public rights-of-way in Denver.[2] In order to obtain such a "permit," the telecommunications provider must, among numerous other things, pay annual fees (which may include in-kind compensation to Denver in the form of facilities, fixtures, or services), on a per-foot usage basis for facilities in the City's right-of-way or, at the provider's choice, an annual use fee of 5% of its gross revenues. Denver Code §§ 10.5–16, 5–17. The Ordinance reserves to Denver the right to deny or revoke permits for a number of reasons, including the breach of any city ordinance, regulation, or condition of the permit.[3] A

---

1. Denver is a political subdivision within the meaning of Senate Bill 96–10. *See* § 38–5.5–102(1).

2. Section 10.5–2 Permits required.

   It shall be unlawful for any Person to occupy, use, or seek to occupy or use, the Rights–of–Way for the purpose of providing Telecommunications Services or any Facilities located in the Rights–of–Way, or who has, or seeks to have, Facilities located in any Rights–of–Way, without first obtaining a Private Use Permit pursuant to this Article. Any Person that maintains Facilities in the Rights–of–Way on the Effective Date shall obtain a Private Use Permit within ninety (90) days of the Effective Date of the Ordinance and furnish a depiction and mapping of their existing Facilities in a format acceptable to the Manager.

3. Section 10.5–31 Denial of permit.
   (a) *Mandatory denial.* Except in the case of an Emergency, no Rights–of–Way Permit will be granted:
   (1) To any Person not authorized to operate in the State of Colorado;
   (2) To any Person who has failed within the past three (3) years to comply, or is presently not in full compliance, with the requirements of this Article;
   (3) To any Person who has outstanding debt owed to the City; or
   (4) To any Person when there exists grounds for the revocation of a Permit.

   (b) *Permissive denial.* The Manager may deny a Permit in order to protect the public health, safety and welfare, to prevent interference with the safety and convenience of ordinary travel over the Rights–of–Way, or when necessary to protect the Rights–of–Way and its users. The City may consider one (1) or more of the following factors: the extent to which Right of Way space where the Permit is sought is available; the competing demands for the particular space in the Rights–of–Way; the availability of other locations in the Rights–of–Way or in other Rights–of–Way for the Facilities of the particular company; the applicability of law that affect location of Facilities in the Rights–of–Way; the degree of compliance of the applicant with the terms and conditions of its franchise, this ordinance, and other applicable ordinances and regulations; the degree of disruption to surrounding communities and businesses that will result from the use of that part of the Rights–of–Way; the condition and age of the Rights–of–Way, and whether and when it is scheduled for total or partial reconstruction; and the balancing of the costs of disruption to the public and damage to the Rights–of–Way, against the benefits to that part of the public served by the expansion into additional parts of the Rights–of–Way.

   (c) *Discretionary issuance.* Notwithstanding the provisions of subsections (a) and (b) of this section 10.5–33, the City may issue a Permit in any case where the Permit is necessary: (a) to

number of telecommunications companies—Qwest Corporation,[4] AT & T Communications of the Mountain States, Inc., MCIMetro Access Transmission Services, Inc., ICG Telecom Group, Inc., and Teleport Denver, Ltd.—brought separate actions, challenging the validity of the Ordinance and seeking declaratory, injunctive, and other relief. The parties subsequently entered into stipulations under which Denver agreed not to enforce the challenged provisions of the Ordinance pending the outcome of the cases, and the telecommunications companies agreed to adhere to the unchallenged provisions of the Ordinance. Denver filed a counterclaim against Qwest for inverse condemnation, and in April 1998, the district court consolidated the actions. In an order dated May 12, 1998, the district court dismissed Denver's counterclaim for failure to state a claim for relief. In orders dated March 5, 12, and 19, 1999, it granted motions for judgment on the pleadings in favor of the telecommunications companies and denied their various motions for partial summary judgment. On May 25, the district court accepted the parties' stipulation to dismissal of all remaining claims and granted the parties' Request for Entry of Judgment, declaring the Ordinance invalid.

More specifically, in its Order of March 5, 1999, the district court found that the provisions of Senate Bill 96–10 limiting municipal control over telecommunications providers were not preempted by the Federal Telecommunications Act. However, because the issues of telecommunications services governed by Senate Bill 96–10 involved at least a

prevent substantial economic hardship to a customer of the Permit applicant; (b) to allow such customer to materially improve its Telecommunications Service; or (c) to allow a new economic development project and where the Permit applicant did not have knowledge of the hardship, the plans for improvement of Service, or the development project when it was required to submit its list of next year projects.

Section 10.5–32 Revocation of permits.

(a) Permittees hold Permits issued pursuant to the Article as a privilege and not as a right. The City reserves its right, as provided herein, to revoke any Permit, without refunding any fees, in the event of a substantial breach of the terms and conditions of any statute, ordinance, rule or regulation, or any condition of the Permit. A substantial breach by Permittee shall include, but shall not be limited to, the following:

(1) The violation of any material provision of the Permit;

(2) An evasion or attempt to evade any material provision of the Permit, or the perpetration or attempt to perpetrate any fraud or deceit upon the City or its citizens;

(3) Any material misrepresentation of fact in the application for a Permit;

(4) The failure to maintain the required security and/or insurance;

(5) The failure to complete any work in a timely manner; or

(6) The failure to correct a condition indicated on an order issued pursuant to this section.

(b) If the Manager determines that the Permittee has committed a substantial breach of a term or condition of any statute, ordinance, rule, regulation or any condition of the Permit the Manager shall make a written demand upon the Permittee to remedy such violation. The demand shall state that continued violations may be cause for revocation of the Permit.

Further, a substantial breach, as stated above, will allow the Manager, at his or her discretion, to place additional or revised conditions on the Permit.

(c) Within twenty-four (24) hours of receiving notification of the breach, Permittee shall contact the Manager with a plan, acceptable to the Manager, for its correction. Permittee's failure to so contact the Manager, or the Permittee's failure to submit an acceptable plan, or Permittee's failure to reasonably implement an approved plan, shall be cause for immediate revocation of the Permit. Further, Permittee's failure to so contact the Manager, or the Permittee's failure to submit an acceptable plan, or Permittee's failure to implement an approved plan, shall automatically place the Permittee on Probation for one (1) full year.

(d) From time to time, the Manager may establish a list of conditions of the Permit which, if breached, will automatically place the Permittee on Probation for one (1) full year, such as, but not limited to, working out of the allotted time period or working on Rights–of–Way grossly outside of any Permit issued by the City.

(e) If a Permittee, while on Probation, commits a breach as outlined above, Permittee's Permit will automatically be revoked and the Permittee shall not install Facilities in the Rights–of–Way for one (1) full year, except for Emergency repairs.

(f) If a Permit is revoked, the Permittee shall reimburse the City for the City's reasonable costs, including restoration costs, the costs of collection and reasonable attorneys' fees incurred in connection with such revocation.

4. US West Communications, Inc. was an original party to this action, but filed a motion to amend the caption name in order to reflect its recent merger into Qwest.

mixture of state and local concerns, it would preempt any inconsistent local ordinance. The district court further found that by requiring continued consent for the use of public rights-of-way and exacting compensation for that consent, the Ordinance required a municipal franchise in violation of Colorado constitutional, statutory, and case law. Accordingly, the district court declared the provisions of the Ordinance enacting this municipal franchise void as a matter of law.

Denver appealed the district court's orders granting judgment on the pleadings in favor of the telecommunications companies and its earlier order dismissing Denver's counterclaim directly to this court.[5]

## II.

■ By granting the Plaintiffs' motion for judgment on the pleadings pursuant to C.R.C.P. 12(c), the district court necessarily determined, in light of the controlling law and undisputed facts, that the matter could be finally resolved at that stage. *Smith v. TCI Communications, Inc.*, 981 P.2d 690 (Colo.App.1999). Judgment on the pleadings is appropriate if, from the pleadings, the moving party is entitled to judgment as a matter of law. *Burns Int'l Sec. Servs. Inc. v. Int'l Union*, UPGWA, 47 F.3d 14, 16 (2d Cir.1995); *see also Tripp v. Parga*, 847 P.2d 165 (Colo.App.1992); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 509–10 (1990) ("A Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court will take judicial notice.").

The district court's preemption ruling was therefore proper and can be sustained on review only to the extent that it is dictated by a proper application of the law to the undisputed facts of the pleadings. In this case the controlling law involves not only the meaning of the two enactments at issue but also the powers of the respective governmental authorities enacting them, particularly as they relate to the regulation of telecommunication services and the police and regulatory authority of home rule cities.

## A.

■ The City and County of Denver is a home rule municipality within the meaning of Article XX, § 6 of the Colorado Constitution. As such, it has plenary authority to regulate matters of local concern. *See* Colo. Const. art. XX, § 6. Although both home rule cities and the state may legislate in matters of local concern, the home rule enactment will control in the event of any conflict with state legislation. *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 37 (Colo. 2000); *City & County of Denver v. State*, 788 P.2d 764, 767 (Colo.1990).

■ The state legislature continues to exercise supreme authority over matters of statewide concern, however, and home rule cities may legislate in that area only if the constitution or a statute authorizes such legislation. *Telluride*, 3 P.3d at 37; *City & County of Denver v. State*, 788 P.2d at 767. Because local and statewide concerns are not mutually exclusive, it has been useful to categorize some matters as being of mixed local and statewide concern. *See City & County of Denver v. State*, 788 P.2d at 767. With regard to these matters, home rule cities may legislate as long as such legislation is consistent with state law; to the extent that the home rule action conflicts with state legislation, it is invalid. *Telluride*, 3 P.3d at 37.

■ "There is no litmus-like indicator for resolving whether a matter is of local, statewide, or mixed concern." *Nat'l Adver. Co. v. Dep't of Highways*, 751 P.2d 632, 635 (Colo.1988). Precisely because these legal categories do not reflect factually perfect

---

5. Denver appealed directly to this court on the ground that the court of appeals does not have jurisdiction over appeals from final judgments of the district courts declaring a statute, municipal charter provision, or ordinance unconstitutional. *See* § 13–4–102(1)(b), 5 C.R.S. (2000). While not commenting on the jurisdiction of the court of appeals to review challenges to orders declaring ordinances invalid as preempted by state statute, this court will nevertheless review the case. *See Colo. Ass'n of Pub. Employees v. Dep't of Highways*, 809 P.2d 988, 990 n. 1 (Colo.1991); *Thomas v. County Court*, 198 Colo. 87, 89–90, 596 P.2d 768, 770 (1979).

descriptions of the relevant interests of the state and local governments, categorizing a particular matter amounts to a legal conclusion, involving considerations of both fact and policy. A number of factors have been identified as relevant to this determination, including the need for statewide uniformity, the extraterritorial impact of local legislation, and whether the matter has traditionally been regulated at the state or local level. *Telluride,* 3 P.3d at 37; *Nat'l Adver.,* 751 P.2d at 635. Although not conclusive in itself, a determination by the General Assembly that a matter is of statewide concern is relevant. *Telluride,* 3 P.3d at 37; *Nat'l Adver.,* 751 P.2d at 635.

Quite apart from Senate Bill 96–10's clear declaration that the construction, maintenance, operation, oversight, and regulation of telecommunications providers and their facilities is a matter of statewide concern and interest, § 38–5.5–101(2)(a), the statewide interest in telecommunications services is well established. It has long been recognized in this state that a statewide telephone system, with its need for coordinated intra and interstate communications, is a matter of statewide concern, heavily outweighing any possible municipal interest. *City of Englewood v. Mountain States Tel. & Tel. Co.,* 163 Colo. 400, 405, 431 P.2d 40, 43 (1967).

The considerations upon which this court based its conclusion in *City of Englewood* have not changed in any way that would affect the vitality of this general holding. If anything, advances in technology and the phenomenon of globalization have greatly increased the need for uniformity of regulation, as acknowledged by both the Federal Telecommunications Act and Senate Bill 96–10. *City of Englewood* is consistent with the decisions of other courts similarly recognizing the adverse impact and potential disruption of telephone and other statewide utility-type services resulting from local control over public rights-of-way. *See, e.g., Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1400 (7th Cir.1992) (noting somewhat colorfully that "to run a cable across the state, a telephone company might have to cross a hundred municipal boundaries, and at each one ... it could be held up for monopo-

ly toll, as if ... municipalities were so many little medieval German principalities"); *AT & T Communications v. City of Dallas,* 52 F.Supp.2d 763, 775 (N.D.Tex.1999); *City of Hawarden v. U.S. West Communications, Inc.,* 590 N.W.2d 504, 508–09 (Iowa 1999); *AT & T v. Vill. of Arlington Heights,* 156 Ill.2d 399, 189 Ill.Dec. 723, 620 N.E.2d 1040, 1045 (1993).

■ Denver does not actually challenge the conclusion that telephone service is a matter of statewide concern or that the telecommunications services at issue here are somehow distinguishable. It asserts instead that if Senate Bill 96–10 is construed so broadly as to conflict with the Ordinance, the statute necessarily infringes upon Denver's constitutionally granted right and duty to exercise police powers for the protection of the health, safety, and welfare of its citizens. Indeed, the effect of amending the state constitution by the addition of Article XX was "to grant to home rule municipalities *every power* theretofore possessed by the legislature to authorize municipalities to function in local and municipal affairs," *Four–County Metro. Capital Improvement Dist. v. Bd. of County Comm'rs,* 149 Colo. 284, 294, 369 P.2d 67, 72 (1962) (emphasis in original), including the reasonable exercise of police powers. *See Averch v. City & County of Denver,* 78 Colo. 246, 248, 242 P. 47, 49 (1925).

■ If there is a rational basis for legislating to protect the health, safety, or welfare of the citizens of a municipality, a home rule city may constitutionally do so. *See United States Disposal Sys., Inc. v. City of Northglenn,* 193 Colo. 277, 281, 567 P.2d 365, 368 (1977). Just as with other powers of municipalities, however, a home rule city's police powers are supreme only in matters of purely local concern. The fact that an ordinance is justified as a legitimate exercise of a city's police powers in no way establishes that its substance is purely a matter of local concern and in no way alters its powers vis-a-vis state statutes in matters of mixed or statewide concern. Even though an ordinance may be an otherwise legitimate exercise of a municipality's police powers, to the extent that it conflicts with a state statute

concerning a matter of mixed statewide and local concern it is invalid. *Bennion v. City & County of Denver,* 180 Colo. 213, 216, 504 P.2d 350, 352 (1972) (invalidating local ordinance that prohibited resistance to unlawful arrest in conflict with state statute because matter was not exclusively of local concern); *cf. City & County of Denver v. Howard,* 622 P.2d 568, 570 (Colo.1981) (upholding municipal ordinance governing unlawful interference with a police officer on grounds that it did not actually conflict with state statute).

This limitation on a municipality's exercise of its police powers is no less applicable to the regulation of public utilities. In asserting that an ordinance derived from the exercise of police powers reigns supreme over any utility interest, Denver relies on a line of decisions from this court holding that a municipality, reasonably exercising its police powers to regulate the health, safety, or welfare of its citizens, may compel public utilities to relocate their facilities from the public right-of-way at their own expense. *See Meadowbrook–Fairview Metro. Dist. v. Bd. of County Comm'rs,* 910 P.2d 681 (Colo.1996); *City & County of Denver v. Mountain States Tel. & Tel. Co.,* 754 P.2d 1172, 1176 (Colo. 1988). Even in this limited context, however, the validity of this proposition has always depended upon the non-existence of any contract, franchise agreement, or statute to the contrary. *See Mountain States Tel. & Tel.,* 754 P.2d at 1176. Rather than intimating that regulation of public utilities through the legitimate exercise of a municipality's police powers always implies a matter of purely local concern, these holdings merely find in the exercise of police powers sufficiently public or governmental action to justify allocating costs to the utility. While a Public Utility Commission tariff may not be sufficiently like a statute to implicate a local, statewide, or mixed local and statewide concern analysis, *see U.S. West v. City of Longmont,* 948 P.2d 509, 517 (Colo.1997) (holding that an ordinance controls over a conflicting tariff in any event), an actual statute, like Senate Bill 96–10, clearly controls over a conflicting ordinance in matters of mixed statewide and local concern, even though the ordinance may be a legitimate exercise of the city's police powers.

Similarly, a home rule city's power to grant franchises does not limit the state's authority in matters of statewide or mixed local and statewide concern. Article XXV, upon which Denver relies for its assertion to the contrary, vests the power to regulate public utilities in the Public Utilities Commission and provides that "nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises." Colo. Const. art. XXV. On its face, the Article does not reserve police and licensing powers or the power to grant franchises exclusively to municipalities, but merely clarifies that nothing within the Article itself alters the relationship between the P.U.C.'s power to regulate public utilities and the preexisting powers of a municipality. Article XXV does not purport to have any effect on the ability of the General Assembly to legislate with regard to matters of mixed statewide and local concern, whether or not they involve public utilities.

### B.

In ruling that the Ordinance conflicted with and was therefore preempted by Senate Bill 96–10, the district court relied on its determination that the Ordinance imposes an additional franchise requirement on telecommunications providers. Significantly, *City of Englewood* found not only that the need for a coordinated intra and interstate communications system was a matter of statewide concern, but also that the right of a telephone or telegraph company to maintain its facilities on or in the streets is a franchised right. *City of Englewood,* 163 Colo. at 405–06, 431 P.2d at 43. Accordingly, because Mountain States Telephone already possessed a franchise granted by the state, it could not be forced to seek another from the City of Englewood to maintain its facilities within the city limits. *Id.* at 405, 431 P.2d at 42.

Senate Bill 96–10 does not rely on the concept of "franchise" in granting telecommunications providers the right to occupy the public rights-of-way, but expressly grants providers the rights it intends them to have and expressly limits the authority of political

subdivisions to regulate them. It is therefore unnecessary to demonstrate the existence of a franchise to conclude that the Ordinance directly conflicts with the statute. Conflicts appear on the face of the two enactments.

Central to the district court's holding, and the entire scheme of the Ordinance, is the requirement for a "Private Use Permit" before occupying or using the rights-of-way within the City, whether or not the telecommunications provider had obtained consent or lawfully occupied a public highway before April 12, 1996.[6] Denver Code § 10.5–2. In conjunction with reserving to the City the right to deny or revoke the provider's privilege, *see* §§ 10.5–31 to –32, this provision of the Ordinance clearly requires additional authorization from the City to occupy and utilize its public rights-of-way in direct conflict with Senate Bill 96–10's express provision that telecommunications providers operating under the authority of the Federal Communications Commission or the Colorado Public Utilities Commission "require no additional authorization or franchise by any municipality." § 38–5.5–101(2)(b). By requiring the City's authorization to operate in its rights-of-way generally, rather than merely its approval for particular improvements or facilities, the Ordinance's "Private Use Permit" requirement strikes at the very heart of the statutory prohibition.[7]

Senate Bill 96–10 clearly recognizes the mixed local and statewide nature of the interests involved by declaring that nothing in the statute should "be construed to alter or diminish the authority of political subdivisions to lawfully exercise their police powers with respect to activities of telecommunications providers within their boundaries." § 38–5.5–101(2). While political subdivisions are forbidden from requiring additional consent for providers that already lawfully occupy a public highway, the statute clarifies that it does not "authorize any telecommunications provider to erect any poles or construct any conduit, cable, switch, or related appurtenances and facilities along, through, in, upon, under, or over any public highway within a political subdivision without first obtaining [its] consent," § 38–5.5–106, and specifies that its consent "shall be based upon a lawful exercise of the police power of such political subdivision." § 38–5.5–105. The statute impliedly acknowledges the authority of subdivisions to require construction permits by expressly exempting construction permit fees from its general prohibition against levying any tax, fee, or charge for the right or privilege of engaging in business or for the use of a public highway. § 38–5.5–107(1)(a)(ii).

In light of these mixed statewide and local interests, a home rule city not only retains the discretion to legislate in ways expressly permitted by Senate Bill 96–10 but also in any way that does not actually conflict with state law. Senate Bill 96–10's reservation of the lawful exercise of their police powers to the political subdivisions of the state does not, however, permit Denver to deny or revoke the privilege of occupying or using the public rights-of-way within the City to any provider operating under the authority of the Federal Communications Commission or the Colorado Public Utilities Commission. While it is true that Senate Bill 96–10 does not alter the authority of political subdivisions to lawfully exercise their police powers with respect to telecommunications activities, neither does it enlarge a municipality's powers or purport to reverse the constitutional relationship between state and home rule legislation. Local ordinances enacted pursuant to the lawful exercise of a home rule municipali-

---

6. The plaintiffs also challenged various fee provisions of the Ordinance that appear on their face to conflict with Senate Bill 96–10. Because it is unnecessary to our holding that the Ordinance is invalid and because the relationship in time to the occurrence of fees directly incurred by the political subdivision can involve factual issues that the defendant was not permitted to litigate in this case, we do not determine whether these provisions separately conflict with the statute.

7. Although the Ordinance contains a severability clause, *see* § 10.5–41, and many of its provisions clearly do not conflict with Senate Bill 96–10, the "Private Use Permit" provision constitutes the central mechanism through which the entire scheme of the Ordinance operates, and without it the Ordinance "cannot be salvaged as a meaningful legislative enactment." *City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 70 (Colo.1981); *Pierce v. City & County of Denver,* 193 Colo. 347, 352, 565 P.2d 1337, 1340 (1977).

ty's police powers still control over conflicting state statutes only in matters of purely local concern, not in matters of mixed statewide and local concern. *Telluride*, 3 P.3d at 37; *City & County of Denver v. State*, 788 P.2d at 767.

Senate Bill 96–10 cannot be read to subordinate its express authorization and limitations on local regulation of telecommunications providers to the exercise of local police powers. A municipal ordinance that conflicts with the specific provisions of Senate Bill 96–10 is therefore preempted and invalid, notwithstanding the ordinance's otherwise legitimate intent to exercise municipal police powers.

■ The district court therefore did not err in finding that the issues of telecommunications services governed by Senate Bill 96–10 involve at least a mixture of statewide and local concerns and that the Ordinance is preempted by Senate Bill 96–10.

### III.

In opposing the Plaintiffs' Motion for Judgment on the Pleadings, Denver also asserted that Senate Bill 96–10 must violate Articles XI and II of the Colorado Constitution to the extent that it is held to grant telecommunications providers rights or privileges in the public rights-of-way without a fee. The district court implicitly rejected this argument by entering judgment in favor of the telecommunications companies.

### A.

■ Article XI, section 2 prohibits the state from making "any donation or grant to, or in aid of … any corporation or company … by operation or provision of law … or by donation or devise for public use." The purpose of this provision is to prohibit the state or a political subdivision from transferring public funds to a private company or corporation without receiving any consideration in return. *City of Aurora v. Pub. Utils. Comm'n*, 785 P.2d 1280 (Colo.1990); *see also Lord v. City & County of Denver*, 58 Colo. 1, 143 P. 284 (1914)(holding that an agreement by the City and County of Denver to aid a railroad company in connection with the construction of the Moffat Tunnel violated Article XI, section 2); *Colo. Cent. R.R. Co. v. Lea*, 5 Colo. 192 (1879)(invalidating agreement under which Boulder County planned to transfer 2,000 shares of stock to a railroad upon the railroad's completion of an extension of its line to Cheyenne, Wyoming).

■ Never, however, has this court suggested that Article XI, section 2 would bar the state from regulating a matter of statewide interest in a way that restricts a political subdivision from levying a tax or exacting a fee for the mere use of public rights-of-way across its boundaries. Senate Bill 96–10 does not involve the extension of credit or the transfer of money, tax receipts, or property to a private company. *See Witcher v. Canon City*, 716 P.2d 445 (Colo.1986) (noting that simply altering the city's contractual entitlement to current rents in exchange for the benefits to be received from modernization of the Royal Gorge Bridge was not a donation within the meaning of Article XI); *see also Perl–Mack Enters. v. City & County of Denver*, 194 Colo. 4, 568 P.2d 468 (1977) (forgoing the collection of revenues for sewer services did not violate Article XI).

Furthermore, Senate Bill 96–10 permits charges for the actual costs incurred in allowing telecommunications providers to use the rights-of-way, and it cannot be reasonably argued that the state will receive no consideration in return. *See City of Aurora*, 785 P.2d at 1288 ("Aurora, as any other new utility service customer, would receive electrical utility service which is, after all, exactly what a new customer bargains for.").

Under these circumstances, even if the statute had conferred a monetary benefit on the telecommunications industry generally, it would not be barred by Article XI, section 2 because permitting telecommunications providers to occupy and use the public rights-of-way without acquiring and paying for authorization from every political subdivision in the state furthers a valid public purpose. *See id.* at 1289; *see also In re Interrogatory Propounded by Governor Roy Romer*, 814 P.2d 875, 882 (Colo.1991). Despite Denver's suggestions to the contrary, the statute does serve a valid public purpose by permitting

providers to occupy and utilize the public rights-of-way "for the efficient conduct of their business" to encourage competition and ensure that all consumers benefit from it. § 38–5.5–101.

Other courts addressing this issue in the context of similar constitutional prohibitions against public grants have concluded that the right to use the public rights-of-way for purposes of maintaining utilities does not constitute a grant or donation of public property. *See, e.g., County of Los Angeles v. So. Cal. Tel. Co.* ., 32 Cal.2d 378, 196 P.2d 773, 780 (1948) (rejecting argument that franchise to telephone company granting privilege to maintain its lines and poles on public streets violated California Constitution's anti-gift article); *State v. South Cent. Bell Tel. Co.*, 619 So.2d 749, 754 (La.Ct.App.1993) (holding that telephone company's right to use state land to maintain telephone poles, lines, and other systems did not constitute a grant or donation from the state in violation of the Louisiana Constitution's anti-donation article); *State v. Southwestern Bell Tel. Co.*, 338 Mo. 617, 92 S.W.2d 612, 614 (1936) (holding that telephone company's privilege to place and maintain equipment on public roads did not violate Missouri Constitution's anti-grant provision).

### B.

■ Neither does Senate Bill 96–10 violate Article II, section 11 of the Colorado Constitution, which provides: "No ... law ... making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly." No al-

leged grant or franchise has been held to violate Article II, section 11, perhaps because to come within the constitutional prohibition, the "irrevocable grant" must be contained in the "law." *See In re Interrogatory*, 814 P.2d at 884. In *City of Englewood*, this court rejected a similar challenge to the franchise held by the predecessor of Plaintiff Qwest, holding that no perpetual right was vested in the utility by any statutory grant. *City of Englewood*, 163 Colo. at 407, 431 P.2d at 44. Rather, this court noted that "[t]he right is merely one to continue until the state, which granted the privilege, desires to modify, alter or withdraw it ." *Id.* Nothing within the language of Senate Bill 96–10 suggests otherwise.

### IV.

■ Denver also asserts that Senate Bill 96–10 is preempted by the Federal Telecommunications Act and is therefore invalid. In opposing the plaintiffs' motion for judgment on the pleadings, Denver's original preemption claim alleged that Senate Bill 96–10 infringes upon a right reserved by the Federal Telecommunications Act to local governments to manage public rights-of-way and receive reasonable compensation for the use thereof. *See* 47 U.S.C. § 253(c). This argument was rejected by the district court, and Denver did not pursue it on appeal. It now asserts instead that Senate Bill 96–10 is preempted by the Federal Telecommunications Act because its provisions can potentially bring about effects that run counter to the Act's competitive neutrality requirement.[8]

---

8. The City's preemption argument rests on 47 U.S.C. § 253, which reads in pertinent part as follows:

    (a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

    (b) State regulatory authority. Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis ..., requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

    (c) State and local government authority. Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

    (d) Preemption. If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or

More specifically, Denver asserts that Senate Bill 96–10 creates a competitive disparity favoring established companies over new entrants because telecommunications providers that had facilities existing in the rights-of-way prior to April 12, 1996, do not need additional authority to continue or expand their use of municipal rights-of-way, whereas other providers may additionally require consent from the municipal government. *See* § 38–5.5–106(1)(b). In addition, Denver challenges section 38–5.5–104, which compels telecommunications providers to pay just compensation for the use of state rights-of-way. As just compensation need not be paid for the use of municipal rights-of-way, Denver argues that the statute is not competitively neutral. Some providers will be forced, when municipal rights-of-way become filled to capacity, to pay for the use of state rights-of-way, while others will enjoy the free use of municipal rights-of-way.

On its face, Senate Bill 96–10 is neutral, in no way favoring established telecommunications providers or prohibiting new telecommunications market entrants. Section 38–5.5–106(1)(b) [9] expressly requires *all* telecommunications providers to obtain consent prior to utilizing public rights-of-way, and merely excuses existing facilities from seeking the municipality's consent a second time. Furthermore, Denver's speculative contention about the potentially anti-competitive effects of Senate Bill 96–10 on future entrants raises at most a question concerning the reasonableness of the compensation assessed

against the affected providers rather than the facial validity of the statute.[10]

■■■ Most importantly, Denver failed to raise these arguments in the district court, either in its pleadings or in opposition to the plaintiffs' motion for judgment on the pleadings. Even if Denver had sufficiently developed its Federal Telecommunications Act challenge to allow for meaningful consideration, therefore, the issue has not been adequately preserved for appeal. *See Colo. Permanente Med. Group, P.C. v. Evans*, 926 P.2d 1218, 1228 (Colo.1996) (refusing to address preemption argument that was not raised in lower courts); *Lambdin v. Dist. Court*, 903 P.2d 1126, 1132 (Colo.1995) (same).

## V.

Finally, Denver asserted a counterclaim for inverse condemnation against Qwest on the grounds that even if the state were permitted to authorize telecommunications providers to occupy the public rights-of-way in Denver, doing so would amount to inversely condemning its property, for which it would be entitled to compensation. The district court dismissed the counterclaim on the ground it failed to state a claim for relief because the property allegedly taken was public property.

■■■■ A claim for inverse condemnation derives from both the Federal and State Takings Clauses. *See* U.S. Const. amend. 5;

---

legal requirement to the extent necessary to correct such violation or inconsistency.

47 U.S.C. § 253.

9. Section 38–5.5–106(1)(b) reads:

A telecommunications provider that, on or before April 12, 1996, either has obtained consent of the political subdivision having power to give such consent or is lawfully occupying a public highway in a political subdivision shall not be required to apply for additional or continued consent of such political subdivision under this section.

10. Subsection 253(d), which provides for the preemption of state or local legislation in violation of section 253, noticeably references only subsections (a) and (b) as provisions for which a violation would warrant preemption, whereas

Denver's hypothetical regarding potentially discriminatory rates charged for the use of rights-of-way falls squarely under subsection (c). Both legislative history and case law support the proposition that allegations of discriminatory or unfair charges are to be resolved in private actions by the affected providers but do not implicate preemption of the entire statute. 141 Cong. Rec. S8213 (June 13, 1995) (statement of Sen. Gorton) (indicating that challenges under 253(c) should take place in federal district court and not as a matter of preemption by the Federal Communications Commission); *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 624 (6th Cir. 2000) (holding that 47 U.S.C. § 253(c) "authorizes a private cause of action in federal court for telecommunications providers aggrieved by a municipality's allegedly discriminatory or allegedly unfair and unreasonable rates").

Colo. Const. art. II, § 15.[11] "A taking occurs when an entity clothed with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property." *City of Northglenn v. Grynberg,* 846 P.2d 175, 178 (Colo.1993). Whether a city can validly assert a counterclaim for inverse condemnation against a telecommunications provider operating under the authority of Senate Bill 96–10 depends on a number of considerations, including not only the nature of the property allegedly taken and the nature of the complaining condemnee but also the capacity in which the condemnee holds the particular property.

▆▆▆ It is clear that the Takings Clause encompasses all "private" property, including that owned by state and local governments when condemned by the federal government. *United States v. 50 Acres of Land,* 469 U.S. 24, 31, 105 S.Ct. 451, 455, 83 L.Ed.2d 376 (1984) (holding the city of Duncanville, Texas entitled to just compensation as a result of United States' condemnation of a sanitary landfill owned by the city). The recognition of public entities as potential condemnees entitled to compensation, however, does not obliterate the distinction between public and private property and require compensation for all property held by a public entity. It merely recognizes that when a public entity owns property in a proprietary capacity, it is entitled to compensation as any non-public concern.

Although the governmental/proprietary distinction is often difficult to draw, and has been abandoned in various contexts, *see, e.g., City & County of Denver v. Mountain States Tel. & Tel. Co.,* 754 P.2d at 1175–76 (finding the exercise of police powers a valid substitute for acting in a governmental capacity in allocating the costs of relocation to public utilities), it remains significant with regard to the regulation of public rights-of-way. It is well established that municipalities hold public rights-of-way in a governmental capacity. 4A *Nichols on Eminent Domain* § 15.02[2] (3d ed.1994). Other jurisdictions addressing the issue have held that a state can take public rights-of-way without compensating the municipality within which they are located. *See id.*

Specifically, it was long ago recognized that maintaining telephone and telegraph lines along public highways does not amount to a compensable taking of private property:

A municipal corporation, though holding the fee in its streets, has no private proprietary right or interest in them which entitles it to compensation, under the constitution, when they are subjected to an authorized additional burden of a public nature. Being charged with a public duty only, with respect to the streets under its control, including that of keeping them in repair, the compensation it is allowed to demand or receive for the use of its streets by a telephone company is expressly limited, by the provision of the statute under consideration, to "what may be necessary to restore the pavement to its former state of usefulness," where it is disturbed in the construction of the company's lines.

*City of Zanesville v. Zanesville Tel. & Tel. Co.,* 64 Ohio St. 67, 59 N.E. 781, 785 (1901) (citations omitted).

▆▆▆ Senate Bill 96–10 requires telecommunications providers to bear the cost of construction and allows municipalities to receive compensation that is "reasonably related to the costs directly incurred by the political subdivision in providing services relating to the granting or administration of permits." § 38–5.5–107(1)(b). Denver's inverse condemnation claim amounts to an assertion that its interest in exacting a fee from telecommunications providers for the use of public rights-of-way, beyond costs directly incurred by Denver, must be characterized as private property. As Denver controls public rights-of-way in its governmental capacity, such property is not "private" for purposes of a takings analysis. Moreover, Denver's interest in regulating its rights-of-way is subject to the control of state law, and therefore not a compensable interest, where the matter regulated is one of statewide concern or mixed state and local concern. *See Tellu-*

---

11. Article II, section 15 provides in relevant part that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation."

*ride,* 3 P.3d at 37; *City & County of Denver v. State,* 788 P.2d at 767.

## VI.

While Senate Bill 96–10 clearly contemplates substantial regulation by political subdivisions of the time, place, and manner in which telecommunications providers occupy the rights-of-way within their boundaries, and clearly entitles political subdivisions to recoup their directly incurred costs, there are nevertheless provisions of the Ordinance, integral to its operation, which facially conflict with express limitations of the statute. Furthermore, even when construed this way, Senate Bill 96–10 is not preempted by The Federal Telecommunications Act, does not violate Articles XI or II of the Colorado Constitution, and does not authorize a taking of property for which a political subdivision would be entitled to compensation by inverse condemnation. Therefore, the judgment of the district court declaring invalid sections 10.5–1—10.5–41 of the Denver Municipal Code, and its order dismissing Denver's counterclaim for inverse condemnation are affirmed.