**HCA–HEALTHONE, LLC, d/b/a Sky Ridge Medical Center, Plaintiff–Appellee,**

**v.**

**CITY OF LONE TREE, Colorado, and Jack Hidahl, in his official capacity as the manager of the City of Lone Tree, Colorado, Defendants–Appellants.**

No. 07CA1446.

Colorado Court of Appeals, Div. VI.

Oct. 2, 2008.

Silverstein & Pomerantz, LLP, Neil I. Pomerantz, Robert R. Gunning, Denver, Colorado, for Plaintiff–Appellee.

Icenogle, Norton, Smith, Blieszner, Gilida & Pogue, P.C., Charles E. Norton, J. Michael Keane, Denver, Colorado, for Defendants–Appellants.

Opinion by Judge BERNARD.

In this action for a refund of municipal use tax payments, defendants, the City of Lone Tree (the City) and its manager, appeal the district court's order granting summary judgment for plaintiff, HCA–Healthone, LLC (HCA). We affirm, and we remand to the district court to determine whether attorney fees and costs on appeal should be awarded to HCA.

## I. Background

### A. History of the City's Use Tax

The City was incorporated as a statutory city in December 1995. *See* §§ 31–1–203, 31–2–101, C.R.S.2008. In July 1996, the City Council adopted an ordinance (the 1996 ordinance). It had two express purposes: to impose a 1.5% tax on the sales of tangible and personal property, and the furnishing of services, that occurred in the City; and to establish a 1.5% use tax "for the privilege of using, or consuming, in the City ... any construction and building materials, purchased at retail."

The 1996 ordinance stated that, upon its adoption by the City Council, it would be submitted to the City's voters for approval at an election held in November 1996, to "be conducted in the manner provided by" Colorado Constitution article X, section 20, the Taxpayers' Bill of Rights (TABOR). This issue appeared on the November ballot, and its title stated:

SHALL [THE CITY'S] TAXES BE INCREASED $3.0 MILLION ANNUALLY, SUCH REVENUES TO BE GENERATED SOLELY FROM A SALES TAX NOT TO EXCEED A RATE OF ONE AND ONE–HALF PERCENT PER DOLLAR OF TAXABLE TRANSACTIONS, BEGINNING IN FISCAL YEAR 1997, AND BY WHATEVER ADDITIONAL AMOUNTS ARE PRODUCED EACH YEAR THEREAFTER FROM A SALES TAX NOT TO EXCEED A RATE OF ONE AND ONE–HALF PERCENT PER DOLLAR OF TAXABLE TRANSACTIONS; AND SHALL THE CITY BE AUTHORIZED TO COLLECT AND SPEND, AS A VOTER APPROVED REVENUE CHANGE, SUCH SALES TAX REVENUES ... AS MORE SPECIFICALLY SET FORTH IN [the 1996 ordinance]?

A copy of the 1996 ordinance was incorporated as part of the ballot issue's language. The electorate approved the ballot issue, and the 1996 ordinance went into effect on January 1, 1997.

The City became a home rule city under section 31–2–204, C.R.S.2008, in May 1998. In May 1999, the City Council enacted a new ordinance (the 1999 ordinance), which repealed and replaced the 1996 ordinance. The purpose for the new ordinance was to create a "comprehensive sales tax [o]rdinance establishing the taxes, exemptions, collection and administrative authority and procedures." Like the 1996 ordinance, the 1999 ordinance established a 1.5% sales tax on the sales of tangible personal property and the furnishing of services; and a 1.5% use tax "for the privilege of using, or consuming in the City ... any construction and building materials, purchased at retail." The 1999 ordinance was not submitted to the voters.

It was, however, repealed by an ordinance passed by the City Council in 2003 (the 2003 ordinance), which, as relevant here, significantly expanded the use tax to 1.5% "for the privilege of storing, using, distributing or consuming in the City any article of tangible personal property, purchased at retail." The 2003 ordinance stated that the 1999 ordinance would be repealed unless the 2003 ordinance was found to be unenforceable. If that event occurred, then the 1999 ordinance would be "deemed in full force and effect." Otherwise, the 2003 ordinance stated it would

become effective in July 2003. The 2003 ordinance did not contain any language requiring that it be approved by the City's voters.

In 2004, the City passed an ordinance (the 2004 ordinance) submitting the expanded use tax to the voters and, upon the voters' approval of the expanded tax, repealing the 2003 ordinance. The 2004 ordinance stated, in relevant part:

- TABOR "requires any tax policy change of a district that results or would result in a net tax revenue gain to have voter approval in advance"; and
- The City "proposes upon an approving vote of its qualified and registered electors to restate with amendment its sales and use tax ordinance which will constitute a tax policy change resulting in a net tax revenue gain without, however, any tax rate increase, new tax, extension of an expiring tax, or property tax increase or mill levy increase above that of the prior year."

The voters did not approve the 2004 ordinance at the November election.

After the defeat of the 2004 ordinance at the polls, City officials issued several documents which indicated that they believed that the existing use tax only applied to construction and building materials. For example, a December 2004 letter from the City's sales tax administrator stated that the City "does not require anyone to pay use tax other than on construction and building materials." The City also refunded use taxes paid by several businesses between 2003 and 2006 on property that did not constitute construction and building materials.

In May 2006, the City's voters approved a ballot issue that read:

SHALL CITY ... TAXES BE INCREASED BY UP TO $700,000 ANNUALLY FOR FISCAL YEAR 2003 (FIRST FISCAL YEAR DOLLAR INCREASE) AND BY WHATEVER ADDITIONAL AMOUNTS ARE PRODUCED EACH YEAR THEREAFTER, (SUCH INCREASE RESULTING FROM A CHANGE IN APPLICATION OF THE SALES AND USE TAX TO INCLUDE CERTAIN TRANSACTIONS OCCURRING OUTSIDE THE CITY FOR WHICH A CITY SALES OR USE TAX IS NOT OTHERWISE PAID, AND NOT FROM ANY SALES OR USE TAX RATE INCREASE, ANY NEW TAX, ANY EXTENSION OF AN EXPIRING TAX, AND NOT FROM ANY PROPERTY TAX INCREASE OR MILL LEVY INCREASE), AND SHALL SUCH INCREASED TAXES CONSIST OF SALES AND USE TAXES IMPOSED BY THE CITY THROUGH ORDINANCES ADOPTED FROM TIME TO TIME, SUCH ORDINANCES SUBJECT ONLY TO THE LIMITATIONS CONTAINED IN THE COLORADO AND U.S. CONSTITUTIONS ... AND SHALL THE DELAY IN VOTING ON THIS BALLOT QUESTION SINCE 2003 BE APPROVED AS A VOTER APPROVED DELAY OF UP TO FOUR YEARS AS PERMITTED BY [TABOR]?

In June 2006, the City Council passed an ordinance (the 2006 ordinance) that

impos[ed] a [1.5%] use tax to be paid by every person or entity for exercising the taxable privilege of storing, using, distributing or consuming tangible personal property at retail in the City.

The declarations of policy in the 2006 ordinance included a statement that (1) TABOR "requires any tax policy change of a district that results or would result in a net tax revenue gain to have voter approval in advance"; and (2) in May 2006, the City's voters

voted to restate with amendment the City's sales and use tax ordinance which will constitute a tax policy change resulting in a net tax revenue gain without, however, any tax rate interest increase, new tax, extension of an expiring tax, or property tax increase or mill levy increase above that of the prior year.

The 2006 ordinance became effective in July 2006.

Thereafter, the City posted information on its Internet website informing taxpayers about the "New ... Use Tax Regulations in Effect." The website stated that (1) the City had approved an ordinance "[t]his summer

... that [has] an impact on all persons that do business in the City"; (2) "effective immediately, the City ... is authorized to collect a 1.5% Use Tax upon the purchase of any tangible property on which sales tax was not paid"; and (3) "[a]ll businesses should begin tracking and remitting use taxes effective July 21, 2006."

## B. History of This Case

In August 2003, Skyridge Medical Center (Skyridge) began operations in the City. Skyridge is owned and operated by HCA.

Shortly after Skyridge began operations, an HCA employee asked City officials to clarify the scope of the City's use tax. The officials replied that, upon the enactment of the 2003 ordinance, businesses were required to pay a use tax on all forms of tangible personal property. Beginning in July 2003, HCA began paying the use tax on all of HCA's tangible personal property.

In May 2005, HCA discovered a letter written by the City Attorney stating that the City was only authorized to impose its use tax on construction and building materials. Consequently, beginning in June 2005, HCA stopped paying the City use tax on all tangible personal property except for construction and building materials.

HCA filed a request in November 2005 for a refund of the use taxes it paid to the City between July 2003 and May 2005 in excess of the use tax paid on construction and building materials. The City denied HCA's refund request in May 2006. HCA subsequently filed this action seeking a refund of $447,399. HCA alleged that the use tax in excess of the tax on construction and building materials was levied in violation of TABOR.

The district court granted HCA's summary judgment motion. The court found that (1) the City had failed to comply with TABOR's requirement that new taxes be approved in advance, and, therefore, the City had no authority to levy a use tax on all tangible personal property before the 2006 ordinance became effective; (2) the City could not give the 2006 ordinance retroactive effect because TABOR expressly required the City to obtain voter approval in advance of levying new

taxes; and (3) even if procuring electoral approval to give a new tax retroactive effect were permissible under TABOR, doing so would violate the Fourteenth Amendment and Colorado Constitution article II, section 11, which the district court concluded bars retroactive taxes under circumstances such as are present here. The court ordered the City to refund $447,399 to HCA, and awarded HCA $80,618.75 in attorney fees and $2,313.64 in costs.

## II. Analysis

### A. General Principles

■ On appeal, the City does not contend that there are any material issues of fact that require resolution at trial. Rather, the City argues that the district court erred in its legal conclusions concerning the interplay of TABOR and the various ordinances described above. We review such legal findings de novo, including the court's interpretation of the relevant ballot measures, statutes, and constitutional provisions. *Bruce v. City of Colorado Springs*, 129 P.3d 988, 992 (Colo. 2006); *McIntire v. Trammell Crow, Inc.*, 172 P.3d 977, 979 (Colo.App.2007).

■ Our supreme court has construed TABOR to be a "limitation on the power of the people's elected representatives" imposed by the people themselves. *Bickel v. City of Boulder*, 885 P.2d 215, 226 (Colo.1994)(emphasis omitted). As relevant here, TABOR limits government's ability to tax. "Its provisions require voter approval for certain state and local government tax increases and restrict property, income, and other taxes." *Havens v. Bd. of County Comm'rs*, 924 P.2d 517, 519 (Colo.1996).

■ Because TABOR was added to our constitution by a citizen initiative, we do not employ all the interpretive principles we use when analyzing legislative acts. However, we apply many standard principles. Our aim is to give effect to the voters' intent. We do so by according words found in the constitutional provision their plain, common, and ordinary meanings. *Bruce*, 129 P.3d at 992–93.

■ TABOR provides us with guidance on how to interpret it: "Its preferred interpre-

tation shall reasonably restrain most the growth of government." Colo. Const. art. X, § 20(1). Therefore, if there are multiple interpretation's of TABOR's text, we must choose the one that would "create the greatest restraint" on government's growth. *Bickel,* 885 P.2d at 229.

In looking at TABOR's language, we do not read it "to create an exception that the plain language does not suggest, warrant, or mandate." *Bruce,* 129 P.3d at 993 (quoting *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.,* 3 P.3d 30, 35 (Colo.2000)). If ambiguities are found, we interpret the constitutional provisions as a whole to determine whether we can harmonize them. *Bruce,* 129 P.3d at 992. We avoid "unjust, absurd or unreasonable" results. *Bickel,* 885 P.2d at 229.

### B. Did the 1996 Ordinance Impose a Use Tax on All Tangible Property?

■ The City contends that the 1996 ordinance imposed a use tax on all tangible property. We disagree for the following reasons:

- The text of the ballot issue that the City's voters approved in November 1996 stated that the City's taxes were to be increased, collected, and spent "as more specifically set forth" in the 1996 ordinance. The 1996 ordinance, the text of which was incorporated into the ballot measure, expressly limited the use tax to any "construction and building materials, purchased at retail." Thus, it is clear that the intent of the City's voters was to limit the use tax to construction and building materials, and there is no indication in the language of either the ballot issue or the 1996 ordinance that the use tax would be expanded in the future to include all tangible property.

- At the time the City's voters authorized the 1996 ordinance, the City was a statutory city. Under section 29–2–109(1), C.R.S.2008, a statutory city can only, as relevant here, impose a use tax "for the privilege of using or consuming in the ... city ... construction and building materials purchased at retail." Thus, the scope of the use tax the City's voters approved in the 1996 ordinance was lim-

ited, by law, to construction and building materials. Under such circumstances, we cannot interpret the voter's approval of the 1996 ordinance to express an intent that the City act beyond its authority and contrary to law by imposing a use tax on all tangible personal property. *See Trappers Lake Lodge & Resort, LLC, v. Colorado Dep't of Revenue,* 179 P.3d 198, 201 (Colo.App.2007) (refusing to adopt a proposed construction that would allow violations of the law "with impunity," contravening legislative intent and producing an absurd or unreasonable result).

- The 1999 ordinance, passed after the City became a home rule city, did not expand the use tax beyond the limits described in the 1996 ordinance.

■ The City also contends that its change in status to a home rule city gave it the authority to expand the use tax without complying with TABOR. The City correctly recognizes that a home rule city's enactments control over conflicting state statutes dealing with matters of local concern. *See City & County of Denver v. Qwest Corp.,* 18 P.3d 748, 754 (Colo.2001).

■ However, TABOR is part of our constitution and not a state statute. Therefore, its passage directly modified the powers of home rule cities. *See Four–County Metropolitan Capital Improvement Dist. v. Board of County Comm'rs,* 149 Colo. 284, 294, 369 P.2d 67, 72 (1962) (powers granted to home rule cities by Colorado's constitution may be changed "[o]nly by constitutional amendment"). Further, TABOR clearly addresses a matter of statewide concern in this context because it expressly includes "any local government" within its scope. Thus, to the extent that a home rule city's ordinances conflict with TABOR's requirements, the ordinances are invalid. *See City & County of Denver,* 18 P.3d at 754.

### C. Did the 2006 Ordinance Impose a Use Tax on All Tangible Property Retroactive to 2003?

TABOR requires that a state or local government conduct elections to obtain "voter approval in advance" for

any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain in any district.

Colo. Const. art. X, § 20(4)(a).

The phrase "in advance" means "before, ahead, beforehand." *Webster's Third New International Dictionary* 30 (2002). Thus, we conclude TABOR required the City's voters to approve the application of the use tax to all tangible personal property before it could be expanded beyond the original limitation to construction and building materials.

The City contends that this requirement was satisfied because, when the voters approved the 2006 ordinance, they approved the imposition of a use tax on all tangible property as of 2003. The City bases its argument on the following line of reasoning: (1) although the 2003 ordinance was not submitted to the voters, it expanded the use tax to include all tangible personal property; (2) the 2006 ballot issue stated that the 2006 ordinance did not create a new tax; (3) the 2006 ballot issue asked whether "the delay in voting on this ballot question since 2003 be approved as a voter approved delay as permitted" by TABOR section 20(3)(a); and, therefore, (4) the passage of the ballot issue authorized a use tax on all tangible property effective as of the passage of the 2003 ordinance.

We are not persuaded. We conclude that the 2006 ordinance created a new tax, that the voters' approval of this new tax functions prospectively, not retroactively, and that the City's interpretation of section 20(3)(a) is inconsistent with the plain language of TABOR when read as a whole.

### 1. New Tax

■ The use tax the voters approved in 1996 was limited to construction and building materials. Therefore, the expansion of the use tax to all tangible personal property constituted a new tax on all such property that was not construction or building materials, particularly because it was designed to raise revenue for the City by collecting additional funds. *See Barber v. Ritter,* 170 P.3d 763,

771–72 (Colo.App.2007) (*cert. granted* Nov. 13, 2007).

This new use tax was not approved in 2003, because the 2003 ordinance was not submitted to the City's voters in that year. It was not approved in 2004, either, because the voters rejected the substance of the 2003 ordinance at the polls when the issue was presented to them in November 2004, under the title of the 2004 ordinance.

The first time the voters approved the new use tax was in 2006. Because section 20(4)(a) requires voter approval of new taxes before they may be imposed, we reject the City's argument that the new tax was imposed by the 2003 ordinance, not the 2006 ordinance.

Two factors reinforce this conclusion. First, the City's voters made clear in 2004 that they were not approving a new tax. The City's argument ignores this statement of the voters' intent concerning the expansion of the tax as represented by the 2003 ordinance. *See Bruce,* 129 P.3d at 992–93.

Second, the City made a statement inconsistent with its argument here, which indicates that it did not believe that the use tax had been expanded by the 2003 ordinance. In December 2004, the City issued a letter that stated that the use tax only applied to construction and building materials.

These conclusions lead us to disagree with the City's assertion that the language of the 2006 ballot issue indicated that the expanded use tax was not a "new tax." The expansion of the use tax was not approved by the voters until 2006, and so, under section 20(4)(a), it was not approved by the voters beforehand. Thus, the 2006 ordinance imposed a new tax, despite the language contained in the ballot issue.

### 2. Retroactive Approval

We also disagree with the City's position that, under section 20(3)(a), the voters' approval of the 2006 ordinance functioned to authorize the expansion of the use tax as of 2003. Section 20(3)(a) is found in the "election provisions" of TABOR. It states:

Ballot issues shall be decided in a state general election, biennial local district elec-

tion, or on the first Tuesday in November of odd-numbered years. Except for petitions, bonded debt, or charter or constitutional provisions, districts may consolidate ballot issues and voters may approve a delay of up to four years in voting on ballot issues. District actions taken during such a delay shall not extend beyond that period.

The City contends that the language of this section allows a governmental entity to collect a new tax for a period of up to four years before the voters authorize it. We disagree for several reasons.

The initial sentence of section 20(3)(a) establishes a general rule: citizens vote on ballot issues at elections held in odd-numbered years. TABOR section 20(2)(a) defines "ballot issue" to mean "a non-recall petition or referred measure in an election."

The second sentence of section 20(3)(a) adds detail to the general rule. It indicates that (1) several enumerated types of ballot issues cannot be consolidated with others, and must, therefore, be voted on individually; (2) all other ballot issues can be grouped together in lots of two or more, and the voters may vote on consolidated ballot issues as a package; and (3) the voters may approve a period of up to four years between elections in which they vote on ballot issues.

▪ The third sentence places a limitation on the conduct of state and local governments by establishing that, if voters have approved a delay in voting on a ballot issue, then any action the government takes concerning that issue during a voter-authorized delay cannot continue unless the voters approve the ballot issue. Reading TABOR as a whole, we conclude that this third sentence cannot be interpreted to mean that state or local governments may impose new taxes, collect them, and postpone submitting them to the voters for approval for up to four years.

First, section 20(4)(a) states that voters must approve any new tax in "advance." This is a clear demonstration of the voters' intent in adopting TABOR that approval of a tax must occur before it is imposed, not afterward. Allowing a government to impose a tax and collect it before the voters decide whether to approve it means that the tax will not have been approved in "advance."

Second, section 20(3)(a) does not contain a reference to section 20(4)(a). Therefore, there is no express statement in section 20(3)(a) that the government "actions" described in its third sentence include any of the revenue generating measures listed in section 20(4)(a).

Third, because the term "ballot issue" is defined as "non-recall petition[s] or referred measure[s] in an election," it includes within its scope a variety of issues beyond the revenue generating measures covered by section 20(4)(a), or the issues expressly excluded by section 20(3)(a). *See Zaner v. City of Brighton,* 917 P.2d 280, 284 (Colo.1996)(section 20(3)(a) "may reasonably be construed to apply only to issues of government financing, spending and taxation" governed by TABOR, "and to have no bearing on the people's ability to schedule special elections on local measures not affected by" TABOR). Thus, the second and third sentences of section 20(3)(a) will retain meaning and applicability when applied to ballot issues that do not include the revenue generating measures contained in section 20(4)(a).

Fourth, section 20(4)(a) specifically requires voter approval of new taxes in advance unless one of two exceptions exist. The first exception is triggered "[w]hen annual district revenue is less than annual payments on general obligation bonds, pensions, and final court judgments." Then, TABOR section 20(1) suspends the requirement of advance voter approval of a new tax "to provide for the deficiency."

The second exception is found in TABOR section 20(6). This section allows a government, subject to enumerated conditions, to impose an emergency tax, without first submitting it to the voters, that will automatically expire unless approved by the voters at the next election.

The presence of these clearly articulated exceptions to the requirement that all new revenue generating measures must be approved by the voters in advance indicates that section 20(3)(a) was not designed to

create, by inference, a third exception. *See Riley v. People,* 104 P.3d 218, 221 (Colo.2004) (when construing a statute, the existence of one exception is generally construed as excluding others). By reading section 20(3)(a) in this manner, we remove any potential conflict between sections 20(3)(a) and 20(4)(a) and harmonize them. *See Bickel,* 885 P.2d at 229 ("an interpretation which harmonizes different constitutional provisions is favored").

Last, based on TABOR's emphasis on voter approval obtained in advance of the imposition of new taxes, we conclude that an interpretation of TABOR which requires an election to approve a new tax in advance reasonably restrains government more than the interpretation the City proposes. If we were to adopt the City's interpretation of section 20(3)(a), governments could impose new taxes, and collect and spend the revenue generated by the taxes, for up to four years before submitting them to the voters for approval. This would allow government growth without an election, and, thus, without the consent of the voters that is the axis around which TABOR spins. *See Bickel,* 885 P.2d at 226 (TABOR limits the power of the people's elected representatives).

We conclude that section 20(3)(a) did not authorize the City to impose a new tax and seek the voters' approval for it afterward. Thus, the City's argument that the voters retroactively "ratified" the 2003 ordinance by approving the 2006 ordinance is not persuasive because we have concluded that TABOR does not permit retrospective approval of new taxes.

### III. Conclusion

We conclude that the City's voters approved a new use tax on all tangible personal property in 2006. We further conclude that this approval was not retrospective. Therefore, the City was not entitled to collect from HCA a use tax on tangible personal property, except for construction and building materials, for the period between 2003 and July 21, 2006, the date when the 2006 ordinance became effective. Accordingly, we affirm the district court's judgment that the City must refund to HCA the excess use tax collected during this period, along with ten percent "annual simple interest from the initial conduct." Colo. Const. art. X, § 20(1).

We also affirm the district court's award of attorney fees and costs to HCA. HCA requests an award of attorney fees and costs on appeal. We conclude that, because HCA has prevailed in all respects in this appeal, HCA is entitled to attorney fees and costs on appeal. *See City of Wheat Ridge v. Cerveny,* 913 P.2d 1110, 1115 (Colo.1996) (the determination whether a successful plaintiff in a TABOR case "should be allowed to recover attorney fees is discretionary"). Therefore, under C.A.R. 39.5, we remand to the district court to determine what those fees and costs should be. In conducting this analysis, the district court should employ the factors set forth in *Cerveny. Id.* at 1115–16.

Because we have concluded that the City was not authorized by TABOR to impose a use tax on all tangible personal property between 2003 and 2006, we need not consider whether the City's retroactive levying of the excess use tax violates either the Fourteenth Amendment or Colorado Constitution article II, section 11.

The judgment is affirmed, and the case is remanded to the district court for a determination of the amount of attorney fees and costs on appeal to be awarded to HCA.

Judge J. JONES and Judge PLANK *, concur.

---

\* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2008.