The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 1, 2025

## 2025COA46

**No. 24CA1066, *Americans for Prosperity v. State of Colorado* — Taxation — TABOR — Creation of a New Fee-based Enterprise**

A division of the court of appeals reviews a challenge to S.B. 21-260 alleging that, by creating the enterprises that it did and by increasing the excess state revenues cap, the bill violated the Colorado Constitution and state statutes concerning the collection and spending of state revenue. The division concludes that S.B. 21-260 runs afoul of neither the Taxpayer Bill of Rights (TABOR) nor section 24-77-108, C.R.S. 2024.

COLORADO COURT OF APPEALS     **2025COA46**

Court of Appeals No. 24CA1066
City and County of Denver District Court No. 22CV30971
Honorable Andrew J. Luxen, Judge

Americans for Prosperity, a Colorado nonprofit corporation,

Plaintiff-Appellant,

v.

State of Colorado; Jared Polis, in his official capacity as the Governor of the
State of Colorado; Colorado Department of Revenue; Robert Jaros, in his
official capacity as the Controller for the State of Colorado; Community Access
Enterprise; Clean Fleet Enterprise; Clean Transit Enterprise; Nonattainment
Area Air Pollution Mitigation Enterprise; and Statewide Bridge and Tunnel
Enterprise,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE GROVE
Pawar and Berger*, JJ., concur

Announced May 1, 2025

West Group Law & Policy, Suzanne M. Taheri, Englewood, Colorado; Stinson
LLP, Perry L. Glantz, Denver, Colorado, Charles W. Hatfield, Jefferson City,
Missouri, for Plaintiff-Appellant

Philip J. Weiser, Attorney General, Ryann Hardman, Assistant Attorney
General, Shelby A. Krantz, Assistant Attorney General, Denver, Colorado, for
Defendants-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    This appeal implicates provisions of the Colorado Constitution and state statutes concerning the collection and spending of state revenue.  Plaintiff, Americans for Prosperity (AFP), asserts that the General Assembly violated section 24-77-108, C.R.S. 2024, and the Taxpayer Bill of Rights (TABOR), Colo. Const. art. X, § 20, when it created several enterprises as part of a transportation sustainability bill passed in 2022.  The district court disagreed and granted summary judgment in favor of defendants, the State of Colorado, Governor Jared Polis, the Colorado Department of Revenue, Colorado Controller Robert Jaros, the Community Access Enterprise, the Clean Fleet Enterprise, the Clean Transit Enterprise, the Nonattainment Area Air Pollution Mitigation Enterprise, and the Statewide Bridge and Tunnel Enterprise.  We affirm.

## I.    Background

### A.    TABOR

¶ 2    In 1992, Colorado voters adopted TABOR, which, among other things, limits governmental entities' ability to impose new taxes or increase tax revenue without obtaining advance voter approval.  *See* Colo. Const. art. X, § 20.  TABOR states that its "preferred

interpretation shall reasonably restrain most the growth of government," Colo. Const. art. X, § 20(1), and, to that end, it sets annual caps on governmental spending: "The maximum annual percentage change in state fiscal year spending equals inflation plus the percentage change in state population in the prior calendar year, adjusted for revenue changes approved by voters after 1991." Colo. Const. art. X, § 20(7)(a). Absent exclusion from fiscal year spending limits or voter approval to the contrary, districts must refund to taxpayers revenue exceeding these limits. Colo. Const. art. X, § 20(7)(d); *see also Huber v. Colo. Mining Ass'n*, 264 P.3d 884, 890-91 (Colo. 2011).

¶ 3     TABOR applies to "districts," which it defines as "the state or any local government, excluding enterprises." Colo. Const. art. X, § 20(2)(b). TABOR defines an "enterprise," meanwhile, as "a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined." Colo. Const. art. X, § 20(2)(d); *see also Nicholl v. E-470 Pub. Highway Auth.*, 896 P.2d 859, 867-69 (Colo. 1995).

2

## B. Referendum C

¶ 4    In 2005, Colorado voters adopted a referred measure known as Referendum C.  The measure paused TABOR's spending limits from 2005 to 2010, permitting the state to "retain and spend all state revenues in excess of the limitation on state fiscal year spending."  § 24-77-103.6(1)(a), C.R.S. 2024.  Referendum C then established a new cap on state spending beginning in 2010 that exceeded the limit that TABOR would have otherwise set.  This new limit, dubbed the "excess state revenues cap," was calculated using "the highest total state revenues for a fiscal year" from the 2005-2010 period during which TABOR's spending limits were paused.  § 24-77-103.6(6)(b)(I)(B).  After 2010, the excess state revenues cap was to be "adjusted each subsequent fiscal year for inflation, the percentage change in state population, the qualification or disqualification of enterprises, and debt service changes."  *Id.*

¶ 5    The state spent its revenue in this manner until the 2017-2018 fiscal year, when the General Assembly, by statute, voluntarily reduced the excess state revenues cap for that fiscal year by $200 million.  § 24-77-103.6(6)(b)(I)(C).  During the following two fiscal years, the legislature adjusted the excess state

3

revenues cap only for inflation, state population change, enterprise qualification and disqualification, and debt service changes. § 24-77-103.6(6)(b)(I)(D)-(E).

## C.  Proposition 117

¶ 6     In 2020, Colorado voters adopted a ballot initiative known as Proposition 117, later codified at section 24-77-108(1), which mandated statewide voter approval for any newly qualified or created enterprise receiving more than $100 million in revenue from fees and surcharges during its first five fiscal years. Proposition 117 also required that "[r]evenue collected for enterprises created simultaneously or within the five preceding years serving primarily the same purpose" be aggregated when determining whether voter approval is necessary. § 24-77-108(2). Enterprises serving primarily the same purpose are those that "provide the same services in the same geographic area." § 24-77-108(3)(a).

## D.  Transportation Sustainability Bill

¶ 7     The following year, the General Assembly passed Senate Bill 21-260 (S.B. 21-260). Ch. 250, 2021 Colo. Sess. Laws 1360. The bill's full title was:

> An Act Concerning the Sustainability of the Transportation System in Colorado, and, in Connection Therewith, Creating New Sources of Dedicated Funding and New State Enterprises to Preserve, Improve, and Expand Existing Transportation Infrastructure, Develop the Modernized Infrastructure Needed to Support the Widespread Adoption of Electric Motor Vehicles, and Mitigate Environmental and Health Impacts of Transportation System Use; Expanding Authority for Regional Transportation Improvements; and Making an Appropriation.

*Id.* S.B. 21-260's legislative declaration stated that "[t]he current and future health and prosperity of the state and its growing number of citizens requires the planning, funding, development, construction, maintenance, and supervision of a sustainable transportation system." Sec. 1(1)(a), 2021 Colo. Sess. Laws at 1360.

¶ 8     To accomplish this, S.B. 21-260 created and funded four enterprises (the Community Access Enterprise, the Clean Fleet Enterprise, the Clean Transit Enterprise, and the Nonattainment Area Air Pollution Mitigation Enterprise), Sec. 1(2)(c)(II), 2021 Colo. Sess. Laws at 1364, and expanded the scope of the Statewide Bridge Enterprise to become the Statewide Bridge and Tunnel Enterprise. Sec. 48, § 43-4-805, 2021 Colo. Sess. Laws at 1442.

S.B. 21-260 also reversed the voluntary reduction in the excess state revenues cap that the General Assembly had passed in 2017 by adding $224,957,602 (which we understand to be the inflation-adjusted amount of the previous $200 million reduction) to the cap for the 2020-2021 fiscal year. Sec. 8, § 24-77-103.6(6)(b)(I)(F), 2021 Colo. Sess. Laws at 1385.

## E. The Lawsuit

¶ 9    In April 2022, AFP commenced this action. As relevant to this appeal, it asserted the following:

- S.B. 21-260 violated section 24-77-108 because, without receiving prior voter approval, S.B. 21-260 simultaneously created five enterprises that would generate revenue exceeding $100 million in their first five years of existence.

- S.B. 21-260's creation of five enterprises in a single bill violated the Colorado Constitution's single-subject requirement, *see* Colo. Const. art. V, § 21, because the enterprises serve different purposes.

- S.B. 21-260's increase to the excess state revenues cap violated the single-subject requirement, as increasing

spending was distinct from ensuring the sustainability of Colorado's transportation system.

- S.B. 21-260's increase to the excess state revenues cap violated TABOR because the legislature's voluntary $200 million reduction of the cap during the 2017-2018 fiscal year was irreversible absent voter approval.

¶ 10    Among other things, AFP requested that the district court (1) declare that S.B. 21-260 violated section 24-77-108 or, alternatively, the state constitution; (2) enjoin the enterprises from operating or charging or collecting fees until receiving statewide voter approval; (3) enjoin the Colorado Department of Revenue from collecting fees for, or transferring funds to, the enterprises prior to statewide voter approval; (4) strike the increase to the excess state revenues cap from S.B. 21-260; and (5) alternatively, set aside S.B. 21-260 in its entirety.

¶ 11    Defendants moved for summary judgment, arguing that all of AFP's claims failed as a matter of law.  The district court granted defendants' motion.

## II.    Summary Judgment

¶ 12    We first address whether, as AFP urges, the district court erred by granting summary judgment in favor of defendants when genuine issues of material fact remained that warranted a trial. We conclude that the district court did not err.

### A.    Standard of Review and Applicable Law

¶ 13    We review a trial court's summary judgment ruling de novo. *Robinson v. Legro*, 2014 CO 40, ¶ 10. Summary judgment is appropriate when the pleadings, affidavits, depositions, or admissions demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004). "In the context of a summary judgment proceeding, an issue of material fact is one, the resolution of which will affect the outcome of the case." *Krane v. Saint Anthony Hosp. Sys.*, 738 P.2d 75, 77 (Colo. App. 1987).

¶ 14    At the summary judgment stage, "[t]he moving party bears the initial burden of showing no genuine issue of material fact exists." *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 20. Once this burden is met, the nonmoving party must "establish that there is a triable

8

issue of fact." *D.R. Horton, Inc.-Denver v. D & S Landscaping, LLC*, 215 P.3d 1163, 1167 (Colo. App. 2008). "A court must afford all favorable inferences that may be drawn from the undisputed facts to the nonmoving party, and must resolve all doubts as to the existence of a triable issue of fact against the moving party." *Cotter Corp.*, 90 P.3d at 819. However, the nonmoving party may not rest on the allegations made in the pleadings but instead must provide facts "by affidavit or otherwise" to show that there is a triable issue. *Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 960 (Colo. App. 2009).

## B. Analysis

¶ 15    In alleging that genuine issues of material fact remained when the district court granted summary judgment, AFP incorrectly characterizes questions of law as questions of fact. AFP asserts that the following were fact questions in dispute at the time of the court's ruling: (1) the proper interpretation of section 24-77-108 and whether S.B. 21-260 violated it; (2) the proper interpretation of TABOR and whether S.B. 21-260 violated it; and (3) whether S.B. 21-260 violated the Colorado Constitution's single-subject requirement. These issues, however, posed questions of law that

9

were properly resolved on a motion for summary judgment. *See Gessler v. Colo. Common Cause,* 2014 CO 44, ¶ 7 ("Constitutional interpretation and statutory interpretation present questions of law . . . ."); *TABOR Found. v. Reg'l Transp. Dist.,* 2018 CO 29, ¶ 14 ("When the parties do not dispute the material facts, summary judgment is appropriate if the moving party is entitled to judgment as a matter of law.").

¶ 16    AFP contends that, in response to defendants' summary judgment motion, it "put forth sufficient evidence demonstrating that a triable issue existed regarding the electorate's intent in enacting [section 24-77-108]." This evidence was made up solely of the declaration and deposition testimony of Michael Fields, whom AFP describes as "the primary drafter of . . . Proposition 117," addressing what he actually intended for the ballot initiative to mean when he drafted it. Regardless of his relationship to Proposition 117, however, Fields's opinions about how section 24-77-108 should be interpreted have no bearing on the legal questions before us. *See In re Interrogatories Relating to the Great Outdoors Colo. Tr. Fund,* 913 P.2d 533, 540 (Colo. 1996) ("When courts construe a constitutional amendment that has been adopted

10

through a ballot initiative, any intent of the proponents that is not adequately expressed in the language of the measure will not govern the court's construction of the amendment."); *see also Davidson v. Sandstrom*, 83 P.3d 648, 655 (Colo. 2004) ("The intent of the drafters, not expressed in the language of the amendment, is not relevant to our inquiry.").

¶ 17    Thus, Fields's declaration and deposition testimony created no triable issue *of fact* precluding summary judgment, and the district court appropriately resolved the issues before it as a matter of law.

### III.    S.B. 21-260's Legality

¶ 18    According to AFP, the General Assembly's passage of S.B. 21-260 violated section 24-77-108, TABOR, and the Colorado Constitution's single-subject requirement.  We are not persuaded.

### A.    Standard of Review and Applicable Law

¶ 19    As noted above, we review a trial court's summary judgment ruling de novo.  *Robinson,* ¶ 10.  Likewise, we review a district court's interpretation of ballot measures, statutes, and constitutional provisions de novo.  *Bruce v. City of Colorado Springs*, 129 P.3d 988, 992 (Colo. 2006); *HCA-Healthone, LLC v. City of Lone Tree*, 197 P.3d 236, 240 (Colo. App. 2008).

¶ 20    We apply general principles of statutory interpretation to ballot initiatives. *Mesa Cnty. Bd. of Cnty. Comm'rs v. State*, 203 P.3d 519, 533 (Colo. 2009). In doing so, we first determine whether the ballot initiative has a plain and ordinary meaning. *Fischbach v. Holzberlein*, 215 P.3d 407, 409 (Colo. App. 2009). "Unless the language is ambiguous, we give effect to the plain language of the ballot question" and do not use extrinsic evidence to ascertain voter intent. *Mesa County*, 203 P.3d at 533-34.

¶ 21    If the ballot language is susceptible of more than one interpretation, we may consider relevant extrinsic evidence to determine the electorate's intent. *Zaner v. City of Brighton*, 917 P.2d 280, 283 (Colo. 1996); *see also Davidson*, 83 P.3d at 655 ("Courts may determine [voter intent] 'by considering other relevant materials such as the ballot title and submission clause and the biennial "Bluebook," which is the analysis of ballot proposals prepared by the legislature.'" (quoting *In re Submission of Interrogatories on House Bill 99-1325*, 979 P.2d 549, 554 (Colo. 1999))); *Grossman v. Dean*, 80 P.3d 952, 962 (Colo. App. 2003) ("While not binding, the Blue Book provides important insight into the electorate's understanding of the amendment when it was

12

passed and also shows the public's intentions in adopting the amendment."). As noted above, however, the intent of the ballot initiative's drafters is irrelevant when not expressed within the language of the ballot initiative. *Mesa County*, 203 P.3d at 534.

B.    Compliance with Section 24-77-108

¶ 22    We agree with the district court's conclusion that S.B. 21-260 did not violate section 24-77-108.

1.    Additional Facts

¶ 23    As codified at section 24-77-108, Proposition 117 states in relevant part:

> (1)    A state enterprise . . . shall not receive more than $100,000,000 in revenue from fees and surcharges in its first five fiscal years unless approved at a statewide general election. . . .
>
> (2)    Revenue collected for enterprises created simultaneously or within the five preceding years serving primarily the same purpose shall be aggregated in calculating the applicability of this section.
>
> (3)    For the purposes of applying the requirements of subsections (1) and (2) of this section:
>
> (a)    Enterprises serve primarily the same purpose when they provide the same services in the same geographic area . . . .

13

¶ 24    S.B. 21-260 directed the five enterprises at issue to do the following:

- It directed the Community Access Enterprise to "reduc[e] and mitigat[e] the adverse environmental and health impacts of air pollution and greenhouse gas emissions produced by motor vehicles used to make retail deliveries to consumers within local communities" by "support[ing] the adoption of electric motor vehicles and electric alternatives to motor vehicles at the community level." Sec. 1(2)(d)(I), 2021 Colo. Sess. Laws at 1364.

- It directed the Clean Fleet Enterprise to "reduc[e] and mitigat[e] the adverse environmental and health impacts of air pollution and greenhouse gas emissions produced by the increasing number of fleet motor vehicles being used to provide transportation network company rides and make retail deliveries" by "supporting the electrification of such fleets and other motor vehicle fleets."  Sec. 1(2)(d)(II), 2021 Colo. Sess. Laws at 1365.

- It directed the Clean Transit Enterprise to "reduc[e] and mitigat[e] the adverse environmental and health impacts of air pollution and greenhouse gas emissions produced by retail deliveries by supporting the replacement of existing gasoline and diesel public transit vehicles with electric motor vehicles." Sec. 1(2)(d)(III), 2021 Colo. Sess. Laws at 1365.

- It directed the Nonattainment Area Air Pollution Mitigation Enterprise to "mitigate[e] the environmental and health impacts of increased air pollution from motor vehicle emissions in nonattainment areas that results from the rapid and continuing growth in retail deliveries made by motor vehicles and in prearranged rides provided by transportation network companies" by providing funding for projects that reduce traffic or directly reduce air pollution. Sec. 1(2)(d)(IV), 2021 Colo. Sess. Laws at 1365.

- And it directed the Statewide Bridge and Tunnel Enterprise to "complete designated bridge projects and tunnel projects, . . . impose a bridge safety surcharge and

15

a bridge and tunnel impact fee and issue revenue bonds, and . . . contract with the state" to receive loans and "to use the revenues generated by the bridge safety surcharge and the bridge and tunnel impact fee to repay" any loans received. Sec. 45, § 43-4-802, 2021 Colo. Sess. Laws at 1440.

### 2. Analysis

¶ 25    The parties disagree on the interpretation of section 24-77-108(2) — specifically, the role played by the phrase "serving primarily the same purpose." AFP contends that this phrase modifies "within the five preceding years." Thus, according to AFP, when assessing whether voter approval for an enterprise is required, enterprise revenue must be aggregated under either of two circumstances: (1) when enterprises created within the five preceding years serve primarily the same purpose; or (2) when enterprises are created simultaneously — irrespective of the purposes those enterprises serve. Based on this interpretation, AFP asserts that S.B. 21-260 violated section 24-77-108 because without first obtaining voter approval, it simultaneously created five

enterprises with projected revenue exceeding $100 million from fees and surcharges in their first five fiscal years.

¶ 26    Conversely, defendants argue that "serving primarily the same purpose" modifies "enterprises." Thus, whether they are created simultaneously or within the five preceding years, enterprise revenue need only be aggregated when those enterprises serve primarily the same purpose, which the five enterprises under S.B. 21-260 do not.[1] Both a plain reading of the statute and consideration of extrinsic evidence confirm that defendants' interpretation of Proposition 117 is correct.

¶ 27    Although the phrase "serving primarily the same purpose" immediately follows the phrase "within the five preceding years" in section 24-77-108(2), "serving primarily the same purpose" must modify "enterprises" because "enterprises" is the nearest subject. While "years" is the nearest noun, "years" is merely part of the prepositional phrase "within the five preceding years." Thus, rules

---

[1] AFP does not challenge defendants' argument that the five enterprises serve different purposes. Indeed, as explained below, AFP argues that the enterprises' different purposes mean that S.B. 21-260 violates the Colorado Constitution's single-subject requirement.

of grammar and plain English both demonstrate that "serving primarily the same purpose" cannot modify "within the five preceding years."

¶ 28     This plain reading of the statute is sufficient to ascertain the meaning behind section 24-77-108(2).  But even if we were to conclude that the ballot initiative was ambiguous, extrinsic evidence proper for consideration confirms that voters held this same understanding.  Under a heading that read "What happens if Proposition 117 passes?" the 2020 Bluebook explained: "For *multiple enterprises created to serve primarily the same purpose,* including those created during the past five years, revenue is added together to determine whether voter approval is required."  Legis. Council, Colo. Gen. Assemb., *2020 State Ballot Information Booklet,* Rsch. Publ'n No. 748-1, at 50 (emphasis added), https://perma.cc/8ZRJ-F89W.  This clear statement of Proposition 117's effects puts to rest any uncertainty about its interpretation.

¶ 29     Section 24-77-108(2) only requires voter approval of newly created enterprises when they (1) are created simultaneously or within the preceding five years; (2) serve the same purpose; and (3) have a projected aggregate revenue exceeding $100 million from

18

fees and surcharges in their first five fiscal years. Because it is undisputed that the enterprises at issue here were created for different purposes and no enterprise individually had a projected five-year revenue exceeding $100 million, the General Assembly was not required to seek voter approval before establishing them.

## C. Compliance with TABOR

¶ 30 The district court also correctly determined that S.B. 21-260's addition of $224,957,602 to the excess state revenues cap did not violate TABOR.

¶ 31 According to AFP, once the General Assembly voluntarily reduced the excess state revenues cap in 2017, TABOR's restrictions on increases to state spending prohibited the General Assembly from reverting to the previous cap without first obtaining statewide voter approval. Instead, under Referendum C, the legislature could only increase the cap between fiscal years by an amount tied to "inflation, the percentage change in state population, the qualification or disqualification of enterprises, and debt service changes." § 24-77-103.6(6)(b)(I)(B). Thus, AFP asserts, once the legislature reduced the cap by $200 million, it could only thereafter raise the cap consistent with these variables.

19

¶ 32    AFP's position misapprehends Referendum C.  True, Referendum C restricts annual cap increases to amounts tethered to the variables that AFP cites.  But the annual cap is just that: a cap.  Referendum C limits the annual growth of the maximum amount of money that the state is "authorized to retain and spend." § 24-77-103.6(2.5)(c)(II).  It does not, however, limit the annual growth of the amount of money that the state actually spends *within that permissible range.*

¶ 33    We conclude that such a limitation would conflict with TABOR's "preferred interpretation . . . reasonably restrain[ing] most the growth of government," Colo. Const. art. X, § 20(1), by creating a "use-it-or-lose-it" principle encouraging the state to spend money even when it is not needed.  Indeed, imposing such consequences would discourage precisely the type of fiscal prudence that led the General Assembly to voluntarily reduce the cap in the first place, and it would conflict with the Colorado Supreme Court's "consistent[] reject[ions] [of] interpretations of TABOR that 'would hinder basic government functions or cripple the government's ability to provide services.'"  *In re Interrogatory on House Bill 21-*

*1164*, 2021 CO 34, ¶ 31 (quoting *Barber v. Ritter*, 196 P.3d 238, 248 (Colo. 2008)).

¶ 34    In short, the General Assembly's determination that for three fiscal years it did not need to spend all of the money that it was authorized to spend had no impact on the excess state revenue cap approved by voters when they adopted Referendum C. Accordingly, S.B. 21-260's restoration of $224,957,602 to the 2020-2021 fiscal year budget did not run afoul of TABOR.

> ### D.    Compliance with Single-Subject Requirement

¶ 35    Lastly, the district court correctly concluded that S.B. 21-260 did not violate the single-subject requirement. *See* Colo. Const. art. V, § 21 (stating, in pertinent part, that "[n]o bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title").

¶ 36    As noted above, S.B. 21-260's full title was:

> An Act Concerning the Sustainability of the
> Transportation System in Colorado, and, in
> Connection Therewith, Creating New Sources
> of Dedicated Funding and New State
> Enterprises to Preserve, Improve, and Expand
> Existing Transportation Infrastructure,
> Develop the Modernized Infrastructure Needed
> to Support the Widespread Adoption of Electric
> Motor Vehicles, and Mitigate Environmental

21

and Health Impacts of Transportation System Use; Expanding Authority for Regional Transportation Improvements; and Making an Appropriation.

2021 Colo. Sess. Laws at 1360.

¶ 37    AFP contends that S.B. 21-260 violated the single-subject requirement in two ways: (1) it created five enterprises that serve different purposes, and (2) it adjusted the excess state revenues cap in a bill intended instead to ensure the sustainability of Colorado's transportation system.

¶ 38    With respect to the first contention, AFP conflates the purposes served by the enterprises with the subject matter of S.B. 21-260.  But these are two distinct concepts: what each enterprise specifically does is not the same as what subject the bill creating them addresses.  That the enterprises may serve various different purposes is not enough to violate the single-subject requirement; rather, the enterprises' different purposes must concern more than one *subject*.  And in this regard, the enterprises do not differ.  The purposes served by the enterprises are (1) community-level electric vehicle adoption; (2) electrification of motor vehicle fleets; (3) electrification of public transit vehicles; (4) reduction of air pollution

22

in nonattainment areas; and (5) completion of bridge and tunnel projects. Secs. 1(2), 45, 2021 Colo. Sess. Laws at 1364-65, 1440. While each of these purposes is distinct, they each undoubtedly concern S.B. 21-260's sole subject matter: ensuring the sustainability of Colorado's transportation system.

¶ 39    AFP's second argument, that S.B. 21-260's inclusion of an adjustment to the excess state revenues cap violated the single-subject requirement, is similarly unavailing. In its order, the district court reasoned that "S.B. 21-260's title spells out in no uncertain terms that one of its goals is to 'create new sources of dedicated funding' in connection with sustaining Colorado's transportation system." To this end, the court noted, S.B. 21-260 provided for "new or expanded fees associated with the five enterprises" and "other fees that factor into the excess state revenues cap," such as registration fees for electric vehicles and indexing per gallon fuel charges to reflect inflation. And, the court explained, it credited defendants' argument that ensuring the sustainability of Colorado's transportation system "cannot be achieved without a reliable funding source, and increasing the excess state revenues cap is directly related to that goal." We agree

with the district court's conclusion that the increase to the excess state revenues cap was encompassed by the single subject expressed in S.B. 21-260's title, and AFP's conclusory assertions to the contrary do not persuade us otherwise.

## IV. Remaining Issues

¶ 40　　In light of the foregoing analysis, we do not consider the parties' arguments as to whether (1) the legislature's authority to pass laws is subject only to constitutional limitations rather than limitations imposed by previously enacted statutes, and (2) section 24-77-108 is inapplicable to the Statewide Bridge and Tunnel Enterprise because that enterprise was neither created nor qualified by S.B. 21-260.

## V. Disposition

¶ 41　　The judgment is affirmed.

JUDGE PAWAR and JUDGE BERGER concur.

24